IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARY HALEY and MICHAEL HALEY,
LESLIE BANKS and JAMES HAL BANKS,
ANNIE BUINEWICZ and BRIAN BUINEWICZ,
TERRANCE McIVER and JEAN ANN McIVER,
SUSAN SENYK and CHRISTIAN SENYK,
MATTHEW DELLER and RENEE DELLER,
PATRICIA GROOME, GARY SAMUELS and
MARIE LOHR, on behalf of themselves and
others similarly situated,                                                  OPINION AND ORDER

        Plaintiffs,                                                   14-cv-99-bbc

    v.

KOLBE & KOLBE MILLWORK CO., INC.,

        Defendant,

    and

FIREMAN'S FUND INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

        Intervenor Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs have brought this action under Wisconsin law on behalf of themselves and similarly situated individuals, alleging that defendant Kolbe & Kolbe Millwork Co., Inc. breached express and implied warranties under state law related to allegedly defective windows installed in their homes. The following claims remain in this lawsuit: (1) the

1

express warranty "no defect" claims brought by the Banks, Lohr, Senyk and Deller plaintiffs; (2) the express warranty "failure to honor" claims brought by the McIver and Senyk plaintiffs; and (3) the implied warranty of merchantability claims brought by the Haley, Groome and Samuels plaintiffs. In an order entered on December 18, 2015, I denied plaintiffs' motion to certify national subclasses under Fed. R. Civ. P. 23(b)(2) and (3), but I gave plaintiffs an opportunity to file a renewed request for certification of a limited issue class or classes under Rule 23(c)(4) that addresses the court's concerns. Dkt. #492. I also denied without prejudice the motions in limine that the parties had filed while the motion for class certification was pending before the court for decision. Id.

Now before the court is plaintiffs' renewed motion for class certification in which they propose up to nine new subclasses for the court to consider. Dkt. #496. Although plaintiffs argue that the court can certify 34 common issues under Rule 23(c)(4), they devote most of their 140-page brief to trying to convince the court that certification is still appropriate under Rules 23(b)(2) and (3). Defendant opposes class certification on several grounds but asks the court to first resolve two issues raised in defendant's motions in limine because they bear on the issue of class certification: (1) whether plaintiffs' experts provided reliable and helpful opinions regarding the existence of defects in defendant's windows; and (2) whether defendant's written warranty applies to the types of defects alleged by plaintiffs. Dkt. #506 (citing dkt. ##317 and 402). Also relevant to the court's consideration of defendant's motion to exclude plaintiffs' experts is plaintiffs' motion for leave to file additional evidence as a surreply. Dkt. #388.

2

I agree that it is necessary to reinstate defendant's motion to exclude the expert opinions of Joel Wolf and Haskell Beckham, dkt. #317, because plaintiffs have based their design defect theories and class definitions on those opinions. Having reviewed the submissions filed by the parties, I conclude that the opinions of both experts must be excluded as unreliable and unhelpful to the trier of fact for the reasons stated below. Plaintiffs' motion to file additional evidence will be denied because the evidence could have been produced earlier and, in any event, would not change my decision with respect to the admissibility of the experts' opinions.

Without the experts' opinions, plaintiffs cannot meet their burden of demonstrating that common questions of fact predominate or that they have a viable method of showing class-wide injury with common proof. Accordingly, their motion for class certification, dkt. #496, must be denied. Because the exclusion of plaintiffs' experts prevents certification of any of the proposed classes in this case, it is unnecessary at this point to address whether defendant's written warranty applies to the types of defects alleged by plaintiffs. Finally, I will order plaintiffs to show cause why the exclusion of their experts' opinions would not foreclose the individual claims of the named plaintiffs for the same reasons that it prevents class certification.

OPINION

A. Reinstatement of Defendant's Daubert Motion

The Court of Appeals for the Seventh Circuit has made it clear that "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." American Honda Motor Co. v. Allen, 600 F.3d 813, 815 (7th Cir. 2010) (per curiam). See also Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 675-76 (7th Cir. 2001) ("The district judge [incorrectly] certified the class without resolving factual and legal disputes that strongly influence the wisdom of class treatment."). Such inquiries may include a challenge to a party's expert witness under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). For example, "when an expert's report or testimony is critical to class certification. . ., a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." American Honda, 600 F.3d at 815-16.

In American Honda, the plaintiffs had sought to certify a class of motorcycle owners alleging a design defect affecting the "wobble" (or side-to-side oscillation) in the front steering assembly of their motorcycles. American Honda, 600 F.3d at 814. They based their product defect theory on the opinion of an expert who had created his own methodology and standards that he tested on a single used motorcycle. Id. at 816. The Court of Appeals for the Seventh Circuit found the reliability of the expert's testimony critical to class certification because it was necessary to show that the plaintiffs' claims were capable of class-

4

wide resolution and that the common defect in the motorcycle was a predominant issue. Id. at 817. In a subsequent case, the court of appeals further explained that

> In American Honda, we used the word "critical" broadly to describe expert testimony important to an issue decisive for the motion for class certification. If a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit Daubert ruling. An erroneous Daubert ruling excluding non-critical expert testimony would result, at worst, in the exclusion of expert testimony that did not matter. Failure to conduct such an analysis when necessary, however, would mean that the unreliable testimony remains in the record, a result that could easily lead to reversal on appeal.

Messner v. Northshore University HealthSystem, 669 F.3d 802, 812 (7th Cir. 2012).

In this case, plaintiffs have submitted an expert report from Joel Wolf and Haskell Beckham of Exponent Failure Analysis Associates regarding the performance of defendant's windows, including defendant's aluminum-clad and K-Kron coated windows. Dkt. #281. Wolf offers an opinion that defendant's aluminum-clad casement, awning and picture windows have a defective "sill-to-sash interface" that causes deterioration in the bottom rail of the sash. Id. at 17 and 86. (The sash refers to the material that frames the glass, the rails are the horizontal members of the frame and the sill is the bottom of the window opening where the lower sash rests when the window is closed.) Specifically, Wolf says that the following four design defects cause deterioration in the lower sash rail: (1) an inadequate sill slope, which results in water from precipitation pooling under the sash; (2) an inadequate gap between the sill frame and the bottom of the sash, which allows moisture on the frame sill to wick into the exposed wood of the sash; (3) a weatherstrip gasket installed on the bottom of the sash near the exterior face, which retains water below the sash, allows

5

additional water to wick into the wood of the sash and retards the drying process; and (4) an exposed wood surface on the underside of the sash that is not protected by cladding or paint and is dipped in a water repellent preservative that has limited effectiveness and longevity. Dkt. #281 at 2. With respect to the K-Kron coating, Beckham states that it is not an appropriate choice for a long-term protective coating for wood windows because it cracks, allows moisture into the wood frame and sash and retards the drying process. Id. at 3-4.

Defendant argues that the opinions of Wolf and Beckham are critical to class certification because they form the basis of plaintiffs' design defect theories. Plaintiffs do not contest this point, stating only that the proper procedure is for defendant to resubmit its Daubert motion because the court denied it without prejudice. However, defendant has done this, making clear in its response to plaintiffs' motion for class certification that it is renewing its original Daubert motion, which was fully briefed before the court denied it without prejudice. See dkt. ##318, 382, 385 and 388. Defendant has not changed its argument or added any new arguments to which plaintiffs need to respond. Because plaintiffs do not deny that resolution of the Daubert motion is critical to certification of the newly proposed classes, I will consider it. I note that plaintiffs ask that in the event that court considers defendant's Daubert motion, it reinstate plaintiffs' motions to exclude the opinions of defendant's experts. This is unnecessary because defendant's Daubert motion is dispositive.

B.  Daubert Analysis

The admissibility of scientific expert testimony is governed by Daubert and by Federal Rule of Evidence 702, which provides that "[a] witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  In Daubert, the Supreme Court held that Rule 702 requires the district court to serve as a "gate-keeper" and make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." Fuesting v. Zimmer, Inc., 421 F.3d 528, 534 (7th Cir. 2005, vacated in part on other grds., 448 F.3d 936 (7th Cir. 2006) (quoting Daubert, 509 U.S. at 592–93). Generally, a district court must consider four non-exclusive factors in assessing the reliability of an expert witness:  (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) what the theory's known or potential rate of error is when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Id. (citing Daubert, 509 U.S. at 593-94; Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002)).  "[T]he Daubert inquiry is a flexible one, and . . . an expert's testimony need not satisfy each of the above factors to be admissible." Fuesting, 421 F.3d at 535.

Defendant contends that the opinions of Wolf and Beckham are unreliable because the experts erred in assuming that the underside of the bottom sash is unfinished in all of defendant's windows, performed testing that violates industry standards, did not propose or test any functional, alternative designs for the windows, relied on out-of-date, foreign publications, failed to connect the defect theories with the problems experienced by plaintiffs and did not rule out other causes for the windows' problems. Plaintiffs generally argue that defendant's challenges relate to the weight to be given the experts' report and not to the reliability or admissibility of the opinions. They also point out correctly that Wisconsin does not require a plaintiff in a products liability case to prove that a safer alternative design was commercially available. Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 2009 WI 78, ¶¶ 43-44, 319 Wis. 2d 91, 117-18, 768 N.W.2d 674, 686-87; Sumnicht v. Toyota Motor Sales, U.S.A., Inc., 121 Wis. 2d 338, 370-71, 360 N.W.2d 2, 17 (1984).

Although I agree that several of defendant's concerns seem to relate to the weight of the opinions rather than their admissibility, there are fundamental problems with the experts' analysis that go to the core of the predominance issue and prevent plaintiffs from meeting their burden of demonstrating that they have a viable method of showing class-wide injury with common proof. Reed v. Advocate Health Care, 268 F.R.D. 573, 589 (N.D. Ill. 2009) (finding same). Specifically, Wolf assumed incorrectly that defendant designed its aluminum-clad windows to have an unfinished lower sash and plaintiffs have failed to demonstrate that Beckham's drying tests were scientifically valid or helpful to the trier of fact. I will discuss these problems separately below.

8

1. <u>Mistake of fact with sill-to-sash defect theory</u>

Wolf states in his report that defendant's aluminum-clad casement, awning and picture windows have four design defects, including an "exposed wood surface on the underside of the sash," which work together to cause deterioration. Dkt. #281 at 2 (identifying combination of four defects), 86 (window problems include "very low-sloped and flat sill sections which allow water to pool under the unclad/unfinished edge of the sash") and 48 ("The design of the Kolbe windows previously discussed results in bottom sash rails which are wet for extended periods leading to the decay of the bottom rail initiating from the bottom of the rail."). It is clear from Wolf's report that he assumes that defendant's windows include an unfinished bottom sash rail, as sold. <u>Id.</u> at 45-46 ("Although the wood components of these windows are protected by the cladding or K-Kron/K-Kron II coating, the underside of the sash rails are unprotected by these materials.").

Defendant contends that Wolf's assumption about the unfinished bottom sash rail is incorrect because customers have the choice of ordering their windows unfinished or with a factory-applied finish, including primer, aluminum-cladding or factory-applied paint. It points out that although the named plaintiffs and the owners of the other windows in the nine houses that Wolf inspected all ordered their windows unfinished, the proposed classes include individuals who purchased fully-finished windows and Wolf has not stated any opinion applicable to finished windows. Defendant further contends that it instructs

9

customers who order unfinished windows to finish all four sides of the window, so any resulting deterioration is the result of user error.

Plaintiffs do not seem to dispute defendant's contention that Wolf made an error in assuming that defendant designed its windows to have an unfinished bottom sash rail. Their only response to defendant's argument is that Wolf's opinion about the unfinished sash is "just one aspect of a comprehensive indictment of the design of these windows, and as such are only one aspect of a myriad of valid criticisms that are all firmly grounded in 'scientifically valid principles,' and all of which constitute 'pertinent evidence.'" Dkt. #382 at 18. However, plaintiffs fail to provide any support for their argument that Wolf's mistake is immaterial. As defendant argues, Wolf included the unfinished sash rail as one of four interrelated defects; he did not inspect or discuss windows with a finished bottom sash rail. Nowhere in his opinion does he say that the other three defects would cause rot even if the bottom sash rail of the window had a finish. Further, Wolf testified at his deposition that the design factors all "work together" and it would be a mistake to "parse out" one from the others. Dkt. #310 at 45-46. As a result, Wolf's opinion is unreliable because it is based on a material mistake of fact concerning the design of defendant's aluminum-clad windows.

Plaintiffs state that "even assuming for sake of argument that a particular window was left unfinished due to a failure of the homeowner/contractor to follow installation instructions, such a failure to adhere to the installation instructions was entirely foreseeable by Kolbe and therefore should have been accounted for in the design process. Mr. Wolf's evidence will therefore assist the trier of fact on this point." Dkt. #382 at 18. This

10

argument is not persuasive and does not solve the problem with Wolf's report. Whether defendant should have foreseen that homeowners would not finish their windows does not change the fact that Wolf incorrectly assumed that defendant intended to leave its windows unfinished and did not account for the fact that some windows came with a factory-applied finish. As defendant points out in its reply brief, Wolf's report would not assist the trier of fact because he does not offer any opinion about whether it was foreseeable that homeowners or contractors would not follow instructions with respect to finishing. Moreover, plaintiffs have not offered any other support for such a theory.

After the parties had fully briefed defendant's <u>Daubert</u> motion, plaintiffs filed a motion for leave to file additional evidence as a surreply because defendant had raised this last point for the first time in its reply brief. Dkt. #388. I am denying the motion for several reasons. First, it was plaintiffs who raised the issue of foreseeability in their response brief, and they could have submitted any supporting evidence at that time. Second, the evidence plaintiffs submit with their surreply actually relates to whether defendant finishes the bottom sash rail of its windows, an issue that defendant raised clearly in its initial brief and to which plaintiffs had an ample opportunity to respond. Finally, even if I were to consider the additional evidence, it does not solve the problems with Wolf's opinion.

Plaintiffs have submitted a series of emails dated October 2007 between John Hanrahan at North American Window and George Waldvogel, defendant's Vice President of Procurement, Quality and Service. Dkt. #389, exh. #1. Hanrahan informs Waldvogel that

> [W]e are finding that you guys are leaving bare wood at the bottom of the casement sashes for the identification label. This seems to be the worst possible area to leave unprotected.
>
> * * *
>
> Operating Casements on the bottom do not get any paint/prime in the bottom where you put your identification lettering, – even if we order them primed (we order mostly interior primed) Now when the painter goes to finish paint – he thinks that area is to be left natural – I'm concerned that we have bare wood that could suck up water and possibly rot out the bottom rails if left unprotected.

Id. Plaintiffs say that this communication shows that defendant had knowledge that (1) even when the windows are ordered finished, the bottoms of its window sashes are shipped unfinished; and (2) Kolbe stamps its name and the manufacturing date on the bottom of the sash, indicating that this edge is supposed to be left unfinished. (Defendant has filed a motion in limine to exclude these emails as inadmissible hearsay, dkt. #400, but plaintiffs did not have an opportunity to respond to that motion before the court denied it without prejudice.)

At most, the emails suggest that at some time, defendant may have failed to add finish to windows that *one* customer ordered with primer. It is unclear from the emails how long this practice may have lasted, which customers were affected or whether defendant remedied the mistake in 2007 after being informed of the problem. Contrary to plaintiffs' contentions, the communications do not show that defendant produced only unfinished windows during the class period or that Wolf was correct in assuming that defendant designed its windows to be unfinished. Accordingly, Wolf's opinion will be excluded as unreliable and unhelpful.

2. <u>Testing of K-Kron defect theory</u>

Beckham offers the opinion that K-Kron and K-Kron II are not appropriate choices for window coatings because the product cracks, allows moisture into the wood frames and sashes and delays the drying of wet wood by weeks (52 to 65 hours for bare wood versus 96 to 201 days for K-Kron-coated wood). Dkt. #281 at 3-4, 17 and 74-75. Relying on this information, Beckham concluded that defendant should have used more permeable paint. Dkt. #309 at 55; dkt. #281 at 4 and 80.

As defendant points out, Beckham did not test how susceptible K-Kron is to cracking (which relates to the flexibility of the paint) or cite any standards recommending a certain level of permeability for paint applied to windows. Dkt. #309 at 70. The only tests on which Beckham relied were "drying tests" that he performed on samples of K-Kron-coated wood taken from the windows in the nine houses that he inspected. Dkt. #281 at 74. In the test, Beckham soaked pieces of wood to 100 percent saturation and then sealed all sides with glue and foil except for one side, which was either bare or coated with K-Kron. He then tracked how long it took for each piece of wood to dry. Dkt. #309 at 100. Defendant contends that the drying tests represent nothing more than *ipse dixit* because they merely confirm the common sense notion that bare wood dries faster than painted wood.

Defendant points to deposition testimony in which Beckham admits he did not follow established European or American standards for drying tests but developed his own methodology that has not been tested, published or reviewed by anyone other than his coworkers at Exponent. Dkt. #309 at 82-83 and 93. Defendant contends that Beckham's

13

tests also did not replicate what happens with real windows installed in houses. For example, the wood in windows installed in a house would never become 100 percent saturated and the interior surfaces of the window would provide an avenue for moisture to evaporate, unlike in Beckham's laboratory testing in which he completely sealed all but one side of the wood sample. In his deposition testimony, Beckham agreed that he was not trying to replicate the way wood might dry in a house and that the sole purpose of his experiment was to see how much longer wood coated with K-Kron would take to dry than bare wood. Dkt. #309 at 99-100.

Defendant raises valid concerns. Plaintiffs say almost nothing in response to defendant's criticisms, stating only that Beckham's tests supported his opinion that K-Kron causes windows to retain excessive moisture and leads to rot and decay. Dkt. # at 20-21. This conclusory statement is insufficient to meet the Daubert standard. Plaintiffs have failed to develop any argument showing that Beckham's opinion is based on reliable methods or that it provides relevant information that will be helpful to the trier of fact. Wehrs v. Wells, 688 F.3d 886, 891 n.2 (7th Cir. 2012) (undeveloped and unsupported arguments are considered waived); Nichols v. National Union Fire Insurance Co. of Pittsburgh, PA, 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007) (plaintiffs forfeited arguments by failing to respond in meaningful way). Although Beckham's testing shows that K-Kron-coated wood samples dry much more slowly than samples of bare wood in a laboratory setting, he took no steps to explain how one could extrapolate his results and apply them to wood windows installed in an actual home. Beckham also does not explain how he concluded that the K-Kron-coated

samples dried too slowly. In his report, he states generally that "[w]ater retained in the wood under the K-Kron coating will remain above the fiber saturation point for extended periods of time, eventually leading to wood decay which in turn leads to additional coating failures" and "[t]here are indications in the literature that coatings with too low a permeability will allow moisture to become trapped and increase the chance of decay." Dkt. #281 at 4 and 74. Although Beckham cites what appears to be a drying rate and discusses fiber saturation points, neither he nor plaintiffs attempt to explain how these relate to the results that Beckham observed with the drying of K-Kron-coated wood samples. As a result, I cannot find that Beckham has applied reliable principles and methods or that his opinion would help the jury understand the evidence or determine a fact in issue.

## C. Conclusion

Plaintiffs have based their defect theories and class definitions on their experts' opinions that certain types of windows sold by defendant during the class period contained one or more defects. I find the opinions unreliable and unhelpful to a trier of fact and therefore inadmissible. Without those opinions, plaintiffs cannot meet their burden of demonstrating that common questions of fact predominate or that they have a viable method of showing class-wide injury with common proof. Accordingly, their motion for class certification, dkt. #496, must be denied and all of the class claims dismissed. Although it appears that the exclusion of plaintiffs' experts would also foreclose the individual claims of

the named plaintiffs, I will give plaintiffs until April 8, 2016 in which to show cause why the claims of the named plaintiffs should not be dismissed.

ORDER

IT IS ORDERED that

1. Defendant Kolbe & Kolbe Millwork Co.'s motion to exclude plaintiffs' expert witnesses, dkt. #317, is REINSTATED and GRANTED.

2. Plaintiffs' motion to file a surreply to defendant's motion to exclude plaintiffs' experts, dkt. #388, is DENIED.

3. Plaintiffs' motion for class certification under Fed. R. Civ. P. 23, dkt. #496, is DENIED.

4. Plaintiffs shall have until April 8, 2016 to show cause why the claims of the named plaintiffs should not be dismissed for the same reasons that I am denying the motion for class certification.

Entered this 25th day of March, 2016.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge